# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Brandy Brewer, | No. CV-1:16-1091-SMM |
| Plaintiff, | |
| v. | **ORDER** |
| Leprino Foods Company, Inc., | |
| Defendant. | |

Pending before the Court is Defendant Leprino Foods Company, Inc.'s ("Leprino") motion for summary judgment, or in the alternative, for partial summary judgment. (Doc. 33[1].) Plaintiff Brandy Brewer ("Brewer") filed her opposition. (Doc. 34[2].) Leprino then filed

---

[1] In support of Leprino's motion, Leprino included its Joint Statement of Undisputed Material Facts, its Separate Statement of Undisputed Material Facts, the Declaration of Counsel Angela Clements and its Attachments, the Declaration of Safety Supervisor David Heinks, the Declaration of Human Resource Manager Kes Andersen, the Declaration of Plant Manager Robert Tuttrup, and its Notice of Lodging Deposition Transcripts. (Doc. 33.)

[2] In support of Brewer's opposition to Leprino's motion, Brewer included her Response to Leprino's Separate Statement of Undisputed Material Facts, her Separate Statement of Disputed Facts, her Notice of Lodging Deposition Transcripts, the Declaration of Plaintiff Brandy Brewer and its Attachments, the Declaration of Counsel Roman Otkupman and its Attachments, Brewer's Objection Letter to the Declaration of Human Resource Manager Kes Anderson, Brewer's Objection Letter to the Declaration of Safety Supervisor David Heinks, and Brewer's Objection Letter to the Declaration of Plant Manager Robert Tuttrup. (Doc. 34.)

its reply in support. (Doc. 35[3].)

After review and consideration, the Court will deny in part and grant in part Leprino's motion for summary judgment, and set this matter for a status hearing.

I. **FACTUAL BACKGROUND**

Leprino's motion for summary judgment requires this Court to view the facts in the light most favorable to Brewer, the opposing party. See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).

Leprino is a dairy product manufacturer, who states that it is the world's largest producer of mozzarella cheese. (Doc. 33-1 at 8.) Leprino has 12 manufacturing plants with the largest plant being Lemoore West, in Lemoore, California, which currently has over 1,000 employees. (Id.) The Lemoore West plant operates 24 hours a day, seven days a week. (Id.)

According to Leprino, as a manufacturer using energized equipment, one of its most critical safety procedures is its Lockout/Tagout ("LOTO") policy. (Id. at 9.) Under its LOTO policy, machinery must be locked out and tagged out while an employee is working on it, meaning that the energy sources are disconnected and personally locked by the employee, so that the machine cannot be reenergized and energy cannot be released during employee maintenance. (Id.) Leprino states that its LOTO policy reflects the company's protection of its employees, but also complies with the legal requirement to protect employees from workplace injury or death while servicing or maintaining the machinery. (Id.) In 2011, Leprino states that it enacted a "zero-tolerance" for violations, making even first-time violations of LOTO subject to strong discipline up to and including termination. (Id.) Since 2011, Leprino states that at its Lemoore West plant, it terminated 11 employees, including Brewer, for LOTO violations. (Id.) Of the 11, Leprino discharged Brewer and another female, while the remaining nine were male employees. (Id.)

---

[3] In support of its Reply, Leprino included its updated understanding of the status of its submitted Separate Statement of Undisputed Facts, its Objections to Brewer's Evidence Submitted in Opposition to Leprino's Motion, and its Response to Brewer's Separate Statement of Disputed Material Facts. (Doc. 35.)

1    Brewer started working at Leprino's Lemoore West plant in 2009. (Doc. 34 at 5.) Based on her work performance, in November 2010, Brewer was promoted to a group leader position. (Id., Doc. 33-1 at 10.) According to Leprino, group leaders are responsible for "overseeing and directing the crew and equipment operations for the Processing Department." (Doc. 33-1 at 10.) Brewer was pregnant at the time she received her promotion. (Id.) Three weeks after being promoted to group leader, Brewer took three months of pregnancy and maternity leave, and then returned to work with no restrictions. (Id. at 11.) Shortly thereafter, Brewer took 10 weeks of leave under the Family Medical Leave Act ("FMLA") and pregnancy leave. Then, several months after that, Brewer took pregnancy and baby-bonding leave for four (4) months. (Id.) Brewer returned to work without medical restrictions in March 2012. (Id.) At the end of 2012 and the beginning of 2013, Brewer took additional weeks of baby bonding leave. (Id.)

According to Brewer, she was not provided all leaves of absences she requested during her employment because she requested to take her baby bonding time in March 2012, but was forced back to work when her baby was six weeks old. (Doc. 34-4 at 3.) Brewer states that she had to wait until right before her baby turned one to take baby bonding time. (Id.) In early 2013, Brewer was approved for intermittent FMLA leave as a result of her son's severe asthma, which at one point, required his hospitalization for over a week. (Doc. 34-7 at 72.) As a result, at times Brewer had to take time off work in order to be with her son. (Id.) According to Brewer, her supervisor, Jennifer Miranda ("Miranda"), was negatively effected by Brewing using her approved intermittent FMLA to take off work. (Id. at 69, 76-77.) On numerous occasions, Miranda told Brewer that she was a "bad employee" for taking the FMLA leave. (Id.) Miranda also stated to Brewer that she preferred working with men because they did not have family obligations, and that she was tracking Brewer's FMLA hours in order to "take it to management to get her fired." (Id.) Miranda's comment was made in front of another supervisor, Tiffany Labuga ("Labuga"), who, after hearing it, told Brewer to complain about Miranda's conduct as Miranda was retaliating against her. (Id. at 53, 77, 308-09.)

From April to June, 2014, Brewer discussed the matter with several management personnel at Leprino. Brewer informed Senior Supervisor Erin McDaniel ("McDaniel") about the negative FMLA comments and the threats she received from Miranda. (Id. at 64-69, Doc. 34-4 at 2.) Next, Brewer spoke with Supervisor Jason Rocha ("Rocha") about Miranda's retaliation threats against her regarding use of FMLA leave; Rocha responded that "she was lucky to have a job" at Leprino and "not flipping burgers at Burger King." (Docs. 34-4 at 2, 34-7 at 85-86.) Supervisor Rocha threatened Brewer stating that if she continued to complain, she could lose her job. (Id.) On July 1, 2014, Brewer further complained to Processing Manager Don Doyle ("Doyle") who had the ability to recommend hiring and termination, and had 225 people reporting to him. (Doc. 34-7 at 84-85, 335-36.) Brewer told Doyle about Miranda's retaliation threats against her regarding use of FMLA leave. (Docs. 34-4 at 2, 34-7 at 84-85, 335-36.) Doyle told Brewer to just do her job. (Id.)

The record further shows that Brewer never filed a formal complaint of retaliation or harassment with Leprino. (Doc. 33 at 4.)

Brewer's regular assignment as a group leader was to the palletizer machines, which stack cases of product onto pallets for shipment to customers. (Doc. 33-1 at 12.) According to Leprino, the palletizers at Lemoore West can handle 40 cases per minute. (Id.) The "palletizer room" contains two palletizer machines. (Id.) The palletizer can be operated by two control panels, located in different areas of the machine. (Id.) If one control panel is properly locked out, none of the control panels will energize the machine. (Id.) The proper LOTO procedure for servicing or clearing jams in the palletizer is to: (1) activate two points of control to fully de-energize the palletizer, and (2) place a lock on the second point of control. (Id.) The first point of control is a safety light curtain, which is triggered by motion in front of the sensor. (Id.) Triggering the light curtain stops the palletizer but does not completely de-energize it (meaning the palletizer can be started up again with a push of a button). (Id.) The second point of control is the emergency stop ("E-stop") button, which must be pressed after activating the light curtain and which then must be locked with a personal lock. (Id.) When the light curtain is activated, there is a loud alarm, unless the

E-stop button is also engaged, to remind individuals that the machine is not fully de-energized. (Id.) If the E-stop button is engaged, the alarm will not sound and the palletizer cannot be started at a control panel until the E-stop button is disengaged. (Id.)

According to Brewer, supervisors at Leprino told her that certain pieces of equipment were considered "gray areas" and could be de-energized by flagging the curtain and hitting the E-stop. (Doc. 34-7 at 50.) Specifically, when boxes are jammed (i.e. the palletizer is down), Supervisors Rocha, Labuga, Miranda, McDaniel, and Gorsman, advised Brewer not to fully lock the machines out as Leprino sought to prevent down time. (Doc. 34-4 at 4.) It was standard practice to hit two points of control without placing the lock on the palletizer, and Brewer was instructed to do so, especially during down time as management needed to have the palletizers operating. (Id., Doc. 34-7 at 97-98, 444-46, 451, 467.) In fact, it was common practice to simply flag the curtain, and not hit the E-stop. (Docs. 34-4 at 4, 34-7 at 482-83.) On July 9th, when the palletizer machines were malfunctioning, Brewer states that she was told to hurry up and get the palletizer machine running again or she would be written up by Miranda. (Doc. 34-4 at 4-5.)

On July 9, 2014, one of the palletizer machines became jammed. (Doc. 33-1 at 13.) Supervisor Miranda, who was working on another palletizer machine, came in to help get the machine back up and running. (Id.) After she was unable to find the supervisor on duty, she consulted with Edgar Vega, a Palletizer Operator who was operating the palletizer from the control panel at the bottom of the machine. (Id.) Vega went to restart the palletizer from the control panel, but before he did so, he and Miranda heard the light curtain alarm sounding. (Id.) Both employees then looked up to a large mirror that was positioned to see onto the roller bed of the palletizer. (Id.) They saw a female employee in the palletizer machine, on top of the roller bed on the second story of the machine. (Id.) Miranda went up near the area and observed Brewer climbing off of the rollers. (Id.) Miranda filed an incident report, contending that Brewer had violated the LOTO policy. (Id. at 14.) Per Leprino's LOTO policy, Brewer was suspended pending completion of an investigation by the Safety Department, which included Miranda's incident report. (Id.)

Based on deposition testimony, Brewer contends that on July 9, 2014, male co-workers who were also involved in getting the palletizer unjammed and were not suspended pending a discharge investigation included Rodney Bowerman, Matt Garcia, Joseph Lay, Tommy Chism, Hector Chavez, Jesus Alvarez, Elmer Meade, Brett Cooper, and Edgar Vega. (Docs. 34-7 at 42-44, 444-46, 451, 483, 500-04, 34-4 at 1-4.) According to Brewer, on July 9th, when she walked into the palletizer room, she could see a bunch of people upstairs inside the palletizer machine pulling boxes. (Doc. 34-7 at 100-02.) Brewer states that she and Miranda entered the room at the same time and both went upstairs to the catwalk. (Id. at 101.) Brewer states that she went onto the catwalk to assist, and figure out what was going on with the malfunctioning machine. (Id. at 102.) There was an apparent alarm sounding from the palletizer machine, meaning that the light curtain had been flagged. (Id. at 99, 102.) Later, Brewer went back on the catwalk alone and put the boxes back into the machine, but did not get on the rollers inside the machine. (Id. at 104-05.)

Based on its investigation, Leprino concluded that Brewer failed to properly lock out the top control panel before entering the palletizer, which put her life in imminent danger. (Doc. 33-1 at 14-15.) Plant Manager Tuttrup recommended termination of Brewer's employment and she was discharged effective July 18, 2014. (Id.)

## II. STANDARD OF REVIEW

### Summary Judgment

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may not rest upon the mere allegations or denials of the party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247-48.

## III. DISCUSSION

### A. Claim 2, Brewer's Disparate Treatment Claim

In her Complaint, Brewer's second cause of action alleges that her discharge from Leprino was illegal discrimination based on her gender in violation of California Code § 12940(a) et seq., the California Fair Employment and Housing Act ("FEHA") (Doc. 1 at 17-18.) Leprino moves for summary judgment on this claim. (Doc. 33.)

Because of the similarity between California and federal employment discrimination laws, California follows pertinent federal precedent when applying it to its own employment discrimination statutes. Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (Cal. 2000). The Guz court recognized that California had adopted the three-stage burden-shifting McDonell Douglas test for trying claims of discrimination. Id.; see also Dawson v. Entek Int'l, 630 F.3d 928, 934 (9th Cir. 2011) (stating that when entertaining motions for summary judgment

regarding allegations of employment discrimination arising under state law, federal courts sitting in diversity must apply <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), and its burden-shifting scheme as a federal procedural rule). <u>McDonell Douglas</u> requires first that the employee establish a *prima facie* case of discrimination. <u>Id.</u> (further citations omitted). If the employee so establishes, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. <u>Id.</u> (further citations omitted). If the employer so articulates, the employee must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> (internal quotations and further citations omitted). In light of the similarities between the FEHA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), courts routinely rely on both California and federal case law. <u>See</u> <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923 n.3 (9th Cir. 2000).

A *prima facie* case of discrimination under FEHA requires the plaintiff to show "'that (1) [she] was a member of a protected class, (2) [she] was qualified for the position [she] sought or was performing competently in the position [she] held, (3) [she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.'" <u>Zeinali v. Raytheon</u>, 636 F.3d 544, 552 (9th Cir. 2011) (quoting <u>Guz</u>, 24 Cal. 4th at 355).

However, when an employer moves for summary judgment, the employer bears the initial burden. <u>See</u> <u>Lawler v. Montblanc North America, LLC</u>, 704 F.3d 1235, 1242 (9th Cir. 2013). The employer is required to show either that the employee cannot establish one of the elements of the *prima facie* case or that there was a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment. <u>Id.</u> If the employer meets its burden, the burden shifts and the employee must demonstrate either that the defendant's showing was insufficient or that there was a triable issue of fact material to the defendant's showing. <u>Id.</u> At the summary judgment stage, the plaintiff does not have to prove that the employer's reason for firing her was a pretext for discrimination, but the plaintiff must introduce

evidence sufficient to raise a genuine issue of material fact as to whether the employer's reason was pretextual. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Leprino first argues that Brewer cannot establish her *prima facie* case of discrimination in that she cannot show that similarly situated male employees were treated more favorably. (Doc. 33 at 2-4.) Specifically, Leprino argues that Brewer cannot show that similarly situated male employees were not discharged for similar violations of the LOTO safety policy. (Id.) Additionally, Leprino contends that its discharge of Brewer for the LOTO safety violation was a legitimate, nondiscriminatory reason for its decision to terminate her employment. (Id.) According to Leprino, Plant Manager Tuttrup's decision to discharge Brewer was based on a legitimate reason, her LOTO safety violation, not gender discrimination. (Id.) Leprino contends that numerous employees have been discharged for the LOTO safety violation, both men and women. (Id.)

Brewer disputes Leprino's arguments. (Docs. 34-7 at 100-110, 34-1 at 3-4.) Brewer testified that similarly situated male employees were not discharged for similar violations of the LOTO safety policy. (Id.) It is undisputed that Miranda was Brewer's supervisor as well as the supervisor over other employees assigned to the palletizer machines. Brewer submitted the deposition of co-worker Elmer Meade, who admitted that numerous male employees have violated the LOTO safety policy in front of their supervisors with no action being taken against them; in fact Meade admitting that he was one of those male employees. (Doc. 34-7 at 444-52, 483.) Meade testified that Miranda "looked the other way" regarding these similar incidents and did not report them as required. (Id.) Edgar Vega testified to the same, male employees violating the LOTO safety policy with no action being taken against them. (Id. at 34-7 at 406-07, 413-14.)

The Ninth Circuit Court of Appeals "has set a high standard for the granting of summary judgment in employment discrimination cases." Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1410 (9th Cir. 1996). As the Ninth Circuit has explained, "[w]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate

question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record." Lam v. Univ. of Hawaii, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal quotations omitted).

Here, Leprino moves for summary judgment requiring the Court to view the evidence in the light most favorable to Brewer, the opposing party. See Tolan, 134 S. Ct. at 1866 (reversing entry of summary judgment when allegations not taken in a light most favorable to the opposing party). Leprino's discharge of Brewer for the LOTO safety violation was a legitimate, nondiscriminatory reason. (Doc. 33-1 at 14-15.) At issue is whether Leprino's reason for firing Brewer was a pretext for discrimination and whether Brewer has introduced sufficient evidence to raise a genuine issue of material fact as to whether Leprino's reason was a pretext for sex discrimination. See Coleman, 232 F.3d at 1282.

Brewer has introduced deposition testimony that similarly situated male employees were not discharged for a LOTO safety violation as she was. Under Ninth Circuit precedent, Brewer does not have to establish by a preponderance of the evidence that Leprino's reason for firing her was a pretext for sex discrimination; rather, Brewer must introduce evidence sufficient to raise a genuine issue of material fact as to whether Leprino's reason for discharging Brewer was a pretext for sex discrimination. See id.

The Court finds that Brewer has introduced sufficient evidence to raise a genuine issue of material fact as to whether Leprino's reason was a pretext for sex discrimination. Brewer's submitted evidence shows that Supervisor Miranda treated similarly situated male employees differently than she treated her. On July 9, 2014, male employees were all removing boxes from the palletizer machine without the equipment being locked out. This was done in front of Supervisor Miranda, yet these male co-workers were not suspended pending a discharge investigation for a LOTO violation as was Brewer. Instead, Miranda did not report their violations, and chose to look the other way. Male co-workers that were not suspended pending a discharge investigation included Rodney Bowerman, Matt Garcia, Joseph Lay, Tommy Chism, Hector Chavez, Jesus Alvarez, Elmer Meade, Brett Cooper, and Edgar Vega. (Docs. 34-7 at 42-44, 444-46, 451, 483, 500-04, 34-4 at 1-4.) Elmer Meade

admitted that male employees have violated the LOTO policies in front of their supervisors with no action being taken against them. (Id.)

In like manner, the fact that Leprino's discharge of Brewer was made by Plant Manager Tuttrup does not insulate or provide a defense to discrimination. See Reeves v. Safeway Stores, Inc., 121 Cal. App. 4th 95, 109 (Cal. App. 2004). It is undisputed that Supervisor Miranda initiated the incident report finding Brewer in violation of the LOTO safety policy. Such report was relied upon by the Leprino officials who made the decision to terminate Brewer. Thus, the subsequent officials' ignorance of Miranda's discriminatory actions toward Brewer is not a defense to discrimination because her report contributed materially to the adverse employment decision ultimately made by Plant Manager Tuttrup. See id., see also Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990) (stating that if the committee making the decision to discharge an employee was not aware of a possible discriminatory motive by the supervisor recommending discharge, that if the committee "acted as the conduit of [the supervisor's] prejudice–his cat's-paw–the innocence of its members would not spare the company from liability.")

Thus, based on Ninth Circuit precedent, Brewer has produced sufficient evidence to survive summary judgment. Brewer's evidence raises a genuine issue of material fact as to whether Leprino's reason for her discharge was a pretext for sex discrimination. At trial, the ultimate question of sex discrimination is one that will be resolved through a 'searching inquiry' conducted by the jury based upon a full record. See Lam, 40 F.3d at 1564.

B.   Claim 1, Brewer's Retaliation Claim

Next, Brewer alleges that her discharge from Leprino was a retaliatory discharge in violation of public policy. Brewer cites three different statutes, California's FEHA statute (gender discrimination), the FMLA federal statute, and California Labor Code § 1102.5 in support of her claim. (Doc. 1 at15-16.)

*FEHA*

Under California's FEHA statute, the Court has already found that Brewer has produced sufficient evidence to survive summary judgment on her claim of gender

1 discrimination.

*FMLA, 29 U.S.C. § 2601*

An interference claim under the FMLA does not involve the burden-shifting analysis under McDonnell Douglas. The Ninth Circuit has determined that "there is no room for a McDonnell Douglas type of pretext analysis when evaluating an 'interference' claim under this statute." Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001). In order to prevail on her claim, therefore, a plaintiff must prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. Id. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. Id. (citing Lambert v. Ackerley, 180 F.3d 997 (9th Cir.1999) (en banc)).

Leprino contends that it did not interfere with Brewer's employee rights under FMLA by refusing to authorize FMLA leave or discouraging her from using such leave. (Doc. 33-1 at 21-22.) Leprino states that Brewer took over 12 months of protected FMLA leave during her five years of employment, that she admitted that she returned to the same job each time after leave, and that no one at Leprino ever did anything to interfere with her leave. (Doc. 33 at 4-5.) According to Leprino, Brewer was promoted while pregnant and on pregnancy work restrictions, which was just weeks before she took FMLA maternity leave. (Id.)

According to Brewer, after she was approved for intermittent FMLA leave, Supervisor Miranda told her on numerous occasions that she was a "bad employee" for taking the FMLA leave. (Doc. 34-7 at 69, 76-77.) Miranda also stated to Brewer that she preferred working with men because they did not have family obligations, and that she was tracking Brewer's FMLA hours in order to "take it to management to get her fired." (Id.) Following Miranda's comments and threats, Brewer complained to Supervisor Labuga. (Doc. 34-7 at 308-09.) Labuga confirmed that Brewer advised her of Miranda's complaints and threats about Brewer taking FMLA leave. (Id.) Brewer states that she also discussed her complaints about Miranda with Supervisor McDaniel, Supervisor Jason Rocha, and Processing Manager Don Doyle. (Docs. 34-7 at 64-69, 84-86, 335-36, 34-4 at 2.) Brewer states that shortly after she

complained about Miranda's comments, Miranda retaliated against her by filing a LOTO policy violation against her for which she was discharged. (Doc. 34 at 7.)

The Court has already found that Brewer produced sufficient evidence to survive summary judgment on her claim of gender discrimination involving Supervisor Miranda reporting Brewer for a LOTO violation. Here, Brewer has introduced sufficient evidence to raise a genuine issue of material fact as to whether Supervisor Miranda was retaliating against her for taking intermittent FMLA leave, therefore, it is an additional question of fact for the jury.

*Section 1102.5*

California courts have identified Section 1102.5 as a "whistleblower" statute, intended to codify public policy providing that an employer may not take retaliatory actions against employees for reports made about the workplace. See, e.g., Carter v. Escondido Union High School Dist., 148 Cal. App. 4th 922, 933 (App. 2007) (identifying the provision as "California's general whistleblower statute"). To establish a *prima facie* case of retaliation under § 1102.5, a plaintiff must show that: (1) she engaged in protected activity; (2) she was then subjected to adverse employment action by her employer; and (3) there was a causal link between the two. Robles v. Agreserves, Inc., 158 F. Supp.3d 952, 1007-08 (E.D. Cal. 2016). An employee engages in "protected activity" under § 1102.5 when she discloses "reasonably based" suspicions of illegal activity to the government, law enforcement, or management. Cal. Lab. Code § 1102.5(a). Whether suspicions are "reasonably based" depends on whether the alleged activity violated a statute or regulation, and/or whether a plaintiff was motivated to disclose by a reasonable belief a law had been broken. See Carter, 148 Cal. App. 4th at 933-34.

Leprino argues that Brewer's whistleblower claims fail because Brewer never engaged in a "protected activity" by disclosing "reasonably based" suspicions of illegal activity to the government, law enforcement, or management. (Doc. 33-1 at 20.) According to Leprino, Brewer never filed a formal complaint during her employment and has failed to show that she believed she was disclosing any illegal activity. (Id.) Rather, Leprino contends that

Brewer's complaints regarding Supervisor Miranda encompassed only internal personnel matters involving a supervisor and her employee, rather than the disclosure of a legal violation. (Doc. 35 at 13.)

Brewer testified that her son's medical issues resulted in her needing to take intermittent leave under the FMLA. (Doc. 34-7 at 72.) According to Brewer, Supervisor Miranda retaliated against her for taking leave under FMLA and made negative comments and threatened to recommend her discharge regarding taking such leave. (Id. at 69, 76-77.)

Prior to 2014, only complaints or reports made by an employee to a governmental agency were protected by alleged whistleblower retaliation under § 1102.5. See Robles, 158 F. Supp. 3d at 1008. Complaints or reports made internally to the employer were not protected. See id. However, effective January 2014, the California Legislature amended § 1102.5, such that protected conduct included complaints to an employee's employer regarding alleged whistleblower retaliation.

Here, the Court finds that Brewer only submits conclusory allegations that she engaged in protected activity by disclosing "harassing" conduct by Miranda. Miranda's alleged comment about Brewer's use of FMLA was made in the context that Miranda believed that Brewer was engaging in FMLA misuse. Even when the Court construes the evidence in Brewer's favor, no reasonable jury could find that Brewer's alleged disclosures regarding Miranda's comments constitute "protected activity" under California's whistleblower retaliation statute, § 1102.5, and therefore, Leprino is entitled to summary judgment on this alleged statutory violation.

As to Brewer's allegation that her discharge from Leprino was a retaliatory discharge in violation of public policy, Brewer has submitted sufficient evidence to raise a question of material fact for the jury to determine whether her discharge was a retaliatory discharge in violation of FEHA and the FMLA.

### C.  Claim 3, Brewer's Failure to Prevent Discrimination Claim

Brewer alleges that Leprino failed to take all reasonable steps to prevent discrimination and/or retaliation based on alleged gender discrimination and FMLA

retaliation in violation of California Government Code § 12940(k). (Doc. 34 at 20.) According to Brewer, management at Leprino failed to prevent the discriminatory disparate treatment based on gender and the retaliation in violation of FMLA policy. (Id.)

Leprino contends that this claim fails because no action lies for failure to take steps to prevent discrimination or harassment if no such conduct has in fact occurred. (Doc. 33 at 5.)

Based on the Court's analysis of the first two claims, the Court further denies Leprino's motion for summary judgment on this claim. Whether Leprino failed to take all reasonable steps to prevent discrimination against Brewer based on alleged gender discrimination and FMLA retaliation in violation of California Government Code § 12940(k) is a question of material fact to be submitted to the jury for its determination based on appropriate jury instructions.

D. Claim 4, Brewer's Intentional Infliction of Emotional Distress Claim ("IIED")

Brewer alleges that management at Leprino engaged in "outrageous conduct" that was intended to, and did, cause Brewer severe emotional distress, giving rise to a common law cause of action for IIED. (Doc. 34 at 20-21.)

Here, the alleged wrongful conduct occurred at the worksite in the normal course of the employer-employee relationship. Therefore, the California workers compensation statute, California Workers' Compensation Act ("WCA"), Labor Code § 3602(a), is Brewer's exclusive remedy for any alleged injury that may have resulted. See Miklosy v. Regents of University of California, 44 Cal. 4th 876, 902-03 (Cal. 2008) (claims for IIED that are based on alleged wrongful termination, even whistleblower allegations, preempted and barred by WCA).

Moreover, even if her IIED claim was not pre-empted by the WCA, in order to establish an IIED claim, a plaintiff must prove (1) extreme and outrageous conduct intended to cause emotional distress; (2) she suffered severe or extreme distress; and (3) defendant's outrageous conduct caused her emotional distress. See Hughes v. Pair, 46 Cal. 4th 1035, 1050 (Cal. 2009). For conduct to be outrageous, it must be so extreme as to exceed all

bounds of that usually tolerated in a civilized society. See <u>Trerice v. Blue Cross of Cal.</u>, 209 Cal. App. 3d 878, 883 (1989).

Here, the Court alternatively finds that Brewer has not asserted the type of outrageous conduct allegations that would form the basis of an IIED claim. See <u>Janken v. GM Hughes Elecs</u>., 46 Cal. App. 4th 55, 64-65, 80 (1996) (stating that personnel management decisions, such as discipline or termination, cannot form the basis of an IIED claim, even if improperly motivated).

The Court will grant summary judgment in favor of Leprino on Brewer's IIED claim due to pre-emption by the California WCA. Alternatively, the Court finds that Brewer has not asserted the type of outrageous conduct allegations that would form the basis of an IIED claim.

**IV.  CONCLUSION**

On the basis of the foregoing,

**IT IS HEREBY ORDERED** granting in part and denying in part Defendants' motion for summary judgment. (Doc. 33.)

**IT IS FURTHER ORDERED** denying Defendants' motion for summary judgment on Claims 1 through 3.

**IT IS FURTHER ORDERED** granting Defendants' motion for summary judgment on Claim 4.

**IT IS FURTHER ORDERED** setting this matter for a telephonic status conference on **Wednesday, September 5, 2018, at 2:00 p.m.** in Courtroom 401, 401 West Washington Street, Phoenix, AZ before Senior Judge Stephen M. McNamee. The parties are directed to conference on one single, clear telephone line prior to calling Judge McNamee's chambers at 602-322-7555 five (5) minutes before the start of the proceeding.

DATED this 19th day of July, 2018.

*[signature: Stephen M. McNamee]*
Stephen M. McNamee
Senior United States District Judge

- 16 -